UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30046-KPN

ALICE W. HALPIN,

Plaintiff,

v.

RDC OF CONNECTICUT, INC.,
R.D. CLARK AND SONS, INC.,
KATELAND LEASING, INC.,
PINNACLE TRANSPORTATION, INC. and
CHINA GROVE TRANSPORT, INC.,

Defendants.

## DEFENDANTS' MOTION IN LIMINE
## TO EXCLUDE THE EXPERT TESTIMONY OF JAMES M. BURNS

The defendants, RDC of Connecticut, Inc., R.D. Clark and Sons, Inc., Kateland

Leasing, Inc., Pinnacle Transportation, Inc. and China Grove Transport, Inc. (cumulatively,

"RDC") respectfully request that the Court exclude from evidence the expert testimony of

James M. Burns proffered by the plaintiff.

Mr. Burns is being called by the plaintiff to give his opinion with respect to various

damages claimed by RDC, specifically: (a) costs of vehicle repairs necessary to comply with

federal regulation; (b) the value of petroleum product lost by RDC due to the plaintiff's

contractual misrepresentations; and (c) costs of material spills caused by improperly trained

drivers. See, generally, Expert Report, Exhibit A. As is evidenced by his Expert Report, his

resume and his deposition testimony, Mr. Burns' testimony is inadmissible with respect to any and all of these issues and his proffered testimony should be excluded.[1]

## ARGUMENT

### 1. The Law On Admissibility Of Expert Testimony.

According to Federal Rule of Evidence 702, an expert witness must be qualified by the trial court based on his or her "knowledge, skill, experience, training or education," but only if he or she has "scientific, technical or other specialized knowledge" that will assist the trier of fact either to understand the evidence or to determine a material fact in issue. The intent of the rule is that an expert witness will not be permitted to testify to opinions that are based on skills or expertise possessed by an average juror, but only to opinions that rely on some special skill or expertise that the expert possesses and which an average juror does not.

Even if a witness is qualified as an expert, the Court has a further obligation to ensure that the testimony given by an expert meets certain levels of relevance and reliability. Indeed, Rule 702 limits expert testimony to only that which (1) is based upon sufficient facts or data, (2) is the product of reliable principles and methodology, and (3) is the product of reliable application of the principles or methodology to the facts of the case. In 1993, the United States Supreme Court handed down its opinion in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1973), which supplanted the criteria previously set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923) and set new parameters for admissibility of expert testimony in the federal courts. While Daubert did not change the standards for qualifying a particular witness as an expert, the trial court is entrusted with additional responsibility to prevent unreliable "expert" testimony from reaching the jury. According to the Daubert court,

---

[1] A copy of Mr. Burns' Expert Report is attached hereto as Exhibit A, a copy of his Resume as Exhibit B and relevant portions of his deposition transcript as Exhibit C.

federal trial judges are to act as "gatekeepers" to ensure that scientific expert testimony

reaching the jury ins not only relevant, but in some sense reliable. 509 U.S. at 590.

      As guidance, the Supreme Court listed five factors that should be considered in making

a determination of whether particular expert testimony is sufficiently reliable so as to be

admissible:

> (1) whether the theory or technique used by the expert will assist the jury in determining a material fact;[2]
> (2) whether the theory or technique has been, or can be, tested;
> (3) whether the theory or technique has been subjected to peer review and/or publication;
> (4) whether there is a known or potential rate of error of the theory or technique; and
> (5) whether the theory or technique has been generally accepted in the applicable industry.

509 U.S. at 589-95. While the inquiry should embrace each of these factors, the relative

importance of the factors is case-specific. In any event, the focus of the trial court should be

on the reliability of the particular methodology used, not just the conclusion reached. Id.

      Originally, the criteria set forth in Daubert applied only to scientific expert testimony.

But in 1999, the Supreme Court expanded the Daubert test to all types of expert testimony in

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In Kumho, the Supreme Court

held that:

> ". . . it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. There is no clear line that divides the one from the others . . . There is no convincing need to make such distinctions."

526 U.S. at 148. Thus, the Daubert standards apply to any expert testimony, including the

testimony being proffered by the plaintiff here.

---

[2] This first factor is, essentially, a restatement of FRE 702.

It is well-established that the party proffering expert testimony has the burden of proving the reliability of the technique used by a "preponderance of proof." <u>Daubert</u>, 509 U.S. at 592 n.10.  Thus, in the present instance, the plaintiff bears the burden of proving that the methodology used by Mr. Burns is reliable.

### 2. Mr. Burns Cannot Be Qualified As An Expert Witness Under Rule 702.

With respect to the particular issues about which he will be asked to opine, Mr. Burns has no specialized skill or expertise that puts him in a superior position to the average juror. According to his Expert Report, Mr. Burns will testify about three things:  (a) whether the amount claimed by RDC for repair of its fleet of vehicles was reasonable; (b) whether the amount claimed by RDC for lost product is reasonable and (c) whether the amount spent by RDC because of various material spills is reasonable.  Expert Report, Exhibit A at 2.  In fact, as he stated repeatedly at his deposition, Mr. Burns does not intend to opine that the cost of the repairs was overstated, but merely that the proportion of the repairs attributed by RDC to the plaintiff is overstated.  <u>See</u> Burns Deposition, Exhibit C at 77.  A quick review of the Expert Report, Resume and Mr. Burns' own testimony, however, reveals that Mr. Burns does not have superior knowledge or experience on any of these issues.

In assessing the reasonableness of amounts claimed by RDC for repair of the fleet, Mr. Burns has indicated that his opinion is "based on [his] review of fleet repair records generated as a result of 1 and 5 year inspections."  Expert Report, Exhibit A at 4.  These records are available for introduction as evidence and can be reviewed directly by the jury.  In fact, the Expert Report reveals that Mr. Burns does not base his opinions on any <u>specialized</u> expertise, but on his common-man understanding of the *mechanical aspects* of the various trucks

4

involved.[3] Yet Mr. Burns has no training or expertise in the mechanical aspects of truck design or operation. According to his Expert Report, a copy of which is attached hereto as Exhibit A, Mr. Burns is a principal of the TransLaw Group, which provides consulting services to motor carriers concerning the transportation, logistics, commerce and regulatory aspects of that business. He has never serviced vehicles, has never designed vehicles and has never even been responsible for inspecting vehicles. See Resume, Exhibit B; Burns Deposition, Exhibit C at 105-06. Mr. Burns' lack of expertise in these areas is obvious in the opinions he states in his Expert Report, which are nothing more than summaries of a very limited subset of documentary evidence and expected oral testimony. Since he offers nothing in the way of expertise or skill to the jury's understanding of the evidence, Mr. Burns does not qualify as an expert and his testimony should not be admitted.

On the issue of material spills, Mr. Burns opines that adequate training "does not guarantee that spills or cross-drops won't occur." Expert Report at 5. This is an opinion that neither helps the jury understand the evidence nor relies on any special expertise or knowledge possessed by Burns. Indisputably, it lies within the common experience of every adult that accidents can happen, with or without training. As Mr. Burns' proffered testimony adds nothing to the common experience of the jurors, it is not expert testimony by its very nature, definition and Mr. Burns' opinion should be excluded on that ground alone.

---

[3] Mr. Burns states that "the complained-of conditions would have been easily uncovered either during a thorough inspection prior to purchase or during monthly inspections of the fleet", "[a]bsence of any fleet records noting the problems within 60 days of the purchase leads me to conclude that the conditions were either already known and ignored or that they resulted from use after the purchase", and "Robert Clark is known to me as an experienced operator/owner in the transportation industry who would have or should have been well-aware of the condition of the fleet prior to or shortly after purchasing it." See Expert Report, Exhibit A at 4. To the extent that these opinions are not wholly speculative, the only "expertise" they reflect is Mr. Burns' supposed knowledge – or lack thereof – of the mechanical configuration of the trucks. Yet Mr. Burns has admitted that has no knowledge of the configuration of the trucks. See Burns Deposition, Exhibit C at 102-03.

With respect to the amount claimed by RDC for product lost to spoliation, Mr. Burns'

opinion amounts to nothing more than on completely unsubstantiated statement: "RDC claims

for expenses related to lost product after assuming ownership and control of Pinnacle and

China Grove are without merit." Expert Report, Exhibit A at 5. Mr. Burns provides no

explanation for his bald assertion, conducts no analysis into the claimed lost product and brings

nothing by way of specialized knowledge or experience to bear on the question. As such, his

"expert opinion" on the lost product is nothing of the sort and must be excluded.

### 3. Mr. Burns' Proffered Testimony Fails The *Daubert* Test.

Moreover, the expert testimony proffered by the plaintiff fails to meet virtually every

prong of the Daubert test. Mr. Burns himself best described his analysis at his deposition

when he stated, in response to a question regarding the methodology one could use to arrive at

Mr. Burns' conclusion that RDC overstated its claims:

> **I don't know of any industry standard other than a dart
> board or a Ouija board to be able to come up and say that's
> when that rear hanger assembly became loose.**

Burns Deposition, Exhibit C at 91. In fact, in response to a question about the method he used

to make that determination, Mr. Burns testified that "[t]hat's a difficult thing. That truly

would change with everybody who looked at it regardless of whom they were working with."

Burns Deposition, Exhibit C at 77-78. Mr. Burns has also admitted that there is no scientific

or industry literature that defines a method for making such a determination. Burns

Deposition, Exhibit C at 120-21. Not surprisingly, Mr. Burns' method has never been tested

or subjected to a peer review. Burns Deposition, Exhibit C at 122. In other words, Mr.

Burns' "expert" opinion, by his own admission, is not "expert" at all, but amounts to nothing

more than guesswork.

Despite declaring in his Expert Report that one of the reasons that RDC's claims were overstated was because of the "ordinary wear and tear on the fleet during the winter of 2003-04," (Expert Report, Exhibit A at 4), Mr. Burns admitted at deposition that he could not determine the wear and tear on the fleet during that period. He called his own analysis "an impossible thing to do scientifically." Burns Deposition, Exhibit C at 87. He also confirmed that there is no scientific way to determine what proportion of the fleet maintenance bill was attributable to the plaintiff and what part to RDC and that his opinion on the question was entirely subjective. Burns Deposition, Exhibit C at 90. Indeed, when asked specifically, Mr. Burns admitted that he "would only be speculating" if he were to opine as to what proportion of the maintenance was attributable to the plaintiff. Burns Deposition, Exhibit C at 119. Yet this speculation is the bedrock foundation for the expert testimony the plaintiff hopes to admit.

It is also clear that Mr. Burns' guesswork is not even based upon sufficient knowledge of the facts. For example, although Mr. Burns opines in his Expert Report that the defects ultimately repaired by RDC were easily detected, he admitted at deposition that he has no idea about the particular configuration of the hardware involved and has never even seen it once. Burns Deposition, Exhibit C at 102-03. He further admitted that he had not been provided any information concerning at least some of the plaintiff's maintenance practices. Burns Deposition, Exhibit C at 100.

Additionally, Mr. Burns has already compromised his integrity as an expert witness to the point at which the Court cannot deem any testimony he would provide as being "reliable." In comparing his Expert Report with his deposition testimony, taken months later on May 17, 2006, it is apparent that Mr. Burns misrepresented a number of facts *without any reason or*

*excuse.* The following chart summarizes some of the false statements contained in Mr. Burns'

Expert Report concerning the factual basis for his conclusions:

| | Expert Report | Deposition Testimony (May 17, 2006) |
|---|---|---|
| * | "In completion of this assignment, I . . . read deposition testimony" at 3. | "I read those [deposition transcripts] last evening [and never before]" at 68-69. |
| * | "I have reviewed other documents including . . . a DOT investigative report" at 3. | "I was only able to get what was included in the profile that I received on Pinnacle, [not the actual investigative report]" at 73. |
| | Expert Report | Deposition Testimony (May 17, 2006) |
| * | "In general, I relied on the following types of information . . . Various court filings" at 3. | The only "court filing" reviewed was his Expert Report.  "I don't think that since the time I've been working on this that I've been given any other filings" at 75-76. |

Given the fact that Mr. Burns has already proven himself to be unreliable, he should not be

permitted to testify as an expert witness.

## CONCLUSION

WHEREFORE, for all the reasons stated herein, the proffered expert testimony of

James M. Burns should be excluded.  It is the Court's role, under Rule 702, to ensure that the

jury hears expert testimony only when it comes from a witness with superior knowledge or

experience and when it helps the trier of fact understand the evidence.  Yet here, Mr. Burns

has no knowledge or experience superior to that of an average juror relevant to the issues for

which his testimony is proffered.

It is also the role of the Court, under <u>Daubert</u>, to ensure that expert testimony be

reliable in that it spring from a recognized, tested an critiqued methodology.  Here, by his own

admission, Dr. Burns' testimony is nothing more than conjecture – no more reliable than using

a dart board or a Ouija Board – and that his method (such as it is) has never been published,

tested or subjected in any way to the scrutiny of others in the business.

Beyond that, the Court cannot find Mr. Burns' expert testimony to be reliable when his recitation of the simple facts of what documents he had or had not reviewed at the time he wrote his Expert Report is, by his own later admission, false.

Accordingly, RDC respectfully requests that the proffered expert testimony of Mr. Burns be excluded in its entirety.

Respectfully submitted,

RDC OF CONNECTICUT, INC., R.D. CLARK AND SONS, INC., KATELAND LEASING, INC., PINNACLE TRANSPORTATION, INC. and CHINA GROVE TRANSPORT, INC.,

Defendants

/s/ Lisa M. McCormack

By: _Michael E. MacDonald_

Lisa M. McCormack (BBO #638735)
Michael E. MacDonald (BBO #310610)
Cain Hibbard Myers & Cook, P.C.
66 West Street
Pittsfield, MA 01201
Tel. No.: (413) 443-4771
Fax No.: (413) 443-7694

Dated: June 12, 2006

## CERTIFICATE OF SERVICE

I, Michael E. MacDonald, do hereby certify that a copy of the foregoing document has, on this 12th day of June, 2006, been served on the parties in this action by facsimile and by federal express, with postage affixed and properly addressed to:

Adam J. Basch, Esquire
Bacon & Wilson, P.C.
33 State Street
Springfield, Massachusetts 01103

_Michael E. MacDonald_
Michael E. MacDonald

EXHIBIT A

EXPERT REPORT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30046-KPN

ALICE W. HALPIN,

        Plaintiff

v.

RDC OF CONNECTICUT, INC., R.D.
CLARK AND SONS, INC., KATELAND
LEASING, INC., PINNACLE
TRANSPORTATION, INC. AND
CHINA GROVE TRANSPORT, INC.

        Defendants

## EXPERT REPORT OF JAMES M. BURNS

### I.    ASSIGNMENT

1.    I have been retained by counsel for Alice W. Halpin ("Halpin") to provide an analysis of damages claimed by RDC of Connecticut, Inc. ("RDC"), R.D. Clark & Sons, Inc., ("Clark"), Kateland Leasing, Inc. ("Kateland"), Pinnacle Transportation, Inc. ("Pinnacle") and China Grove Transport, Inc. ("China Grove") in the above-captioned matter.

### II.    QUALIFICATIONS

2.    I am a principal of the TransLaw Group, Inc., a Springfield, Massachusetts based business, which provides consulting services in the transportation, logistics, commerce and regulatory aspects of the motor carrier industry. I have been in private practice before the Interstate Commerce Commission, United States Department of

1

Transportation, the Federal Maritime Commission and various state regulatory agencies. I have been a member of the Association for Transportation Law Professionals since 1977. I have been a consultant to the motor carrier industry for more than thirty years consulting regarding U.S. DOT compliance and enforcement issues and have conducted in-house safety reviews monitoring compliance with U.S. DOT rules and regulations. I am familiar with laws and regulations regarding the transportation of hazardous materials and the disposal of same. I have experience with regard to safety training and drug testing of CDL drivers. See attached Resume.

III.    **SCOPE OF ANALYSIS**

3.    RDC's claims that it has accrued maintenance bills in excess of $187,000.00 in order to comply with DOT regulation. It further alleges that it incurred an expense of approximately $167,200.00 or lost product resulting from spoilage of 88,000 gallons of petroleum product which it alleges was improperly unloaded by employees "inherited by RDC" and an additional $21,000.00 for hazardous material spills allegedly caused by improperly trained drivers. RDC also alleges that it incurred an expense in the approximate amount of $123,590.00 in excess of escrow for repairs of identified deficiencies in the motor carrier fleet. I have been asked to provide analysis of the above-referenced claims on behalf of Alice Halpin.

4.   In completion of this assignment, I reviewed documents produced by both parties, read deposition testimony and performed independent research. I also spoke with representatives of Alice Halpin. I have reviewed the deposition transcripts of Daniel Hill, Robert Clark and Susan Halpin. I have reviewed other documents including invoices, one and five year tank inspection records, a DOT investigative report, relevant schedules from the Stock Purchase Agreement and other correspondence related to those issues. In general, I relied on the following types of information:

- Documentation related to one and five year inspections from various providers;

- DOT rules and regulations;

- Deposition testimony;

- Various court filings;

- Discussions with Alice Halpin's representatives;

- Experience regarding hazardous materials training and disposal.

5.   This report and the opinions expressed herein are based on my analysis of the materials I have reviewed to date. I understand that discovery is on going. I may supplement, refine or revise my analysis as appropriate, if additional testimony, documents or other discovery materials become available. In particular, if any expert reports are submitted on behalf of RDC, I expect to be asked to review any expert analysis related to RDC's claims, and to prepare a rebuttal report if

appropriate. I am being compensated at a rate of $275.00 per hour of time I incur on this matter and a fee of $1,750.00 per day for attendance at court proceedings. Payment is not contingent on my findings or on the outcome of this case.

## IV.  STATEMENT OF OPINIONS TO BE EXPRESSED AND BASIS AND REASONS THEREFOR

6.   RDC's claims for fleet repair are grossly overstated. This opinion is based on my review of fleet repair records generated as a result of 1 and 5 year inspections. Defects claimed necessary to repair to pass the 1 and 5 year inspections appear to have been either in existence at the time RDC inspected the fleet prior to purchase or they arose due to ordinary wear and tear on the fleet during the winter of 2003-2004. The complained of conditions would have been easily uncovered either during a thorough inspection prior to purchase or during monthly inspections of the fleet once RDC purchased it. Absence of any fleet records noting the problems within 60 days of the purchase leads me to conclude that the conditions were either already known and ignored or that they resulted from use after the purchase. Many of the types of defects would be easily detected or could be presumed to exist in tanks that were 15 years old. Robert Clark is known to me as an experienced operator/owner in the transportation industry who would have or should have been well-aware of the condition of the fleet prior to or shortly after purchasing it. Without detailed records of maintenance or inspection both before

and after the purchase, it is impossible to determine when the tankers came out of compliance with DOT regulations.

RDC claims for expenses related to lost product after assuming ownership and control of Pinnacle and China Grove are without merit. Training employees in the proper delivery of and/or response to spills of hazardous materials is an evolving and on-going process. RDC is required by DOT regulations to train its employees yearly. The "cross-drop" incidents are not ordinarily the subject matter of hazmat training since it does not involve a "release" of the hazardous material. Evidence of cross-drops occurring even after RDC provided company-wide hazmat training demonstrates that the cross-drops were caused by human error and not any systematic lack of training. As with any preventative training program, mv experience in that field confirms that attendance at training programs does not guarantee that spills or cross-drops won't occur.


SIGNED:


_____/s/James F. Burns_____
JAMES F. BURNS

EXHIBIT B

EXPERT RESUME

.

# RESUME – JAMES M. BURNS

## PERSONAL INFORMATION

Name:                        James M. Burns

Address:                     40 Wildflower Lane
                             Longmeadow, MA  01106

Date of Birth:               February 29, 1948

Telephone Number:            413 567 6680

## PROFESSIONAL INFORMATION

Employer:                    The Translaw Group, Inc.

Address:                     Suite 304  935 Main Street
                             Springfield, MA  01101-4835

Telephone Number:            413 781 8205

Facsimile:                   413 734 7839

Cell:                        413 539 8219

Email:                       JBURNS@TRANSREGS.COM

Web Site:                    www.transregs.com

## EDUCATIONAL AND PROFESSIONAL QUALIFICATIONS

### Education Qualifications

1962 – 1966                  Longmeadow High School

1966 – 1968                  Holyoke Community College
                             Holyoke, Massachusetts
                             *Associates Degree, Business Administration*

1976 – 1977                  Academy of Advanced Traffic
                             New York City, New York
                             *Transportation Law Certificate*

1

# RESUME – JAMES M. BURNS

## Professional Qualifications

| | |
|---|---|
| 1977 | Admitted to practice before the |

- Interstate Commerce Commission
- Untied State Department of Transportation, Federal Motor Carrier Safety Administration
- Federal Maritime Commission
- Various state transportation regulatory commissions
- Ontario Ministry of Transportation
- Quebec Ministry of Transportation

Member:    The Association of Transportation Law Professionals

## EMPLOYMENT HISTORY

1968 – 1973    Warehouse Transport, Inc.
Springfield, MA

Transportation Supervisor

Contract Carrier to the Great Atlantic & Pacific Tea Company.

1973 – 1977    Pittsburgh & New England Trucking Company
Dravosburg, PA

New England Regional Manager

Multi State heavy and specialized carrier

1977 – Present    The Translaw Group, Inc.

A transportation regulatory permitting, compliance, and consulting practice.

Principal/Registered Practitioner, private practice, representing,
- for-hire motor carriers,
- private carriers,
- fleet operators,

THE TRANSLAW GROUP, INC.

## RESUME – JAMES M. BURNS

- freight forwarders,
- brokers,
- independent ocean forwarders and;
- various shipper interest,

on a variety of complex regulatory compliance issues, simulated compliance reviews, and regulatory permitting relative to drivers, vehicles and entities.

Publications and Lectures:

**TRANSTRENDS**, a monthly regulatory newsletter with a readership of approximately 450 subscribers.

Regular speaker before various transportation trade groups and transportation associations.

THE TRANSLAW GROUP, INC.

EXHIBIT C

CITED PAGES OF BURNS DEPOSITION

burns may 17 06.txt

1

1                          Volume 1, Pages 1-112

2                              Exhibits:  1-2

3                  UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
4            ---------------------------

5   ALICE HALPIN,
         Plaintiff
6

7   vs.                      Docket No. 05-30046-KPN

8   RDC OF CONNECTICUT, INC.,
    R.D. CLARK AND SONS, INC.,
9   KATELAND LEASING, INC.,
    PINNACLE TRANSPORTATION, INC.,
10  and CHINA GROVE TRANSPORT, INC.,
         Defendants
11

12            ----------------------------

13            DEPOSITION OF JAMES M. BURNS

14             Wednesday, May 17, 2006

15             9:11 a.m. - 11:53 a.m.

16               BACON & WILSON, P.C.

17                33 State Street

18            Springfield, Massachusetts

19

20            PERLIK AND COYLE REPORTING

21                1331 Main Street

22            Springfield, Massachusetts
                    Page 1

burns may 17 06.txt

3      Q.  Let's turn then to your Statement of

4   Opinions to be Expressed and Basis and Reasons

5   Therefor, which is Roman IV.  Paragraph 6 you first

6   say, "RDC's claims for fleet repair are grossly

7   overstated."  When we talk about fleet repair, are

8   we talking simply trailers?

9      A.  Trailers, right.

10     Q.  When you say they're "grossly overstated,"

11  can you tell us the process that you went through in

12  reaching that opinion.

13     A.  When I say "grossly overstated," certainly

14  the repairs were done and somebody got a bill for

15  them.  What I think I'm referring to there is the

16  portion that should be the responsibility of Halpin,

17  it's grossly overstated.  I take no exception to

18  what a repair facility submitted as a bill.

19  Somebody must have reviewed that before I did.

20     Q.  What was the process that you went through

21  in determining what is properly attributable to

22  Halpin and what was properly attributable to someone

23  else?

24     A.  That's a difficult thing.  That truly would

burns may 17 06.txt

67

1    change with everybody who looked at it regardless of

2    whom they were working with.  But you look at the

3    types of repairs that were done that were not of the

4    one and five year inspection, just the general

5    maintenance.  Some of the general maintenance, in my

6    opinion, was still being neglected six, seven,

7    eight, nine months after the purchase.  It just

8    wasn't done.  I'm sure that when you leave

9    something, even if it's not a safety issue, if you

10   let something go, you're going to have a larger

11   problem at the end.

12            When does that problem start and what is

13   the split as to responsibility, that's something

14   that you look at and you try to see what was done.

15   For example, if you're replacing reflectors and mud

16   flaps, those to me are something that happened

17   shortly ago.  That's not something that should be

18   running around for months.  You make a judgement and

19   that's basically how, as I'm looking through each

20   invoice, that's how I do it.

21      Q.  First of all, in your review of all the

22   materials and information that we've described, did

Page 78

burns may 17 06.txt

19    alignment and new front tires and maybe some tie-rod

20    ends and a few other things.  So you look at the

21    amount, the age, the types of repairs.  Some of the

22    repairs were just general wear and tear.  I mean,

23    maintenance happens.  It just has to be taken care

24    of.

☐

75

1      Q.  How do you determine what was general wear

2    and tear occurring from November '03 to the spring

3    of '04 and what was pre-existing deferred

4    maintenance?

5      A.  That's an impossible thing to do

6    scientifically, so it's really an opinion of what

7    your experience has been, what was, again I say,

8    what types of maintenance procedures had to be

9    performed.

10           As I mentioned to you earlier, the dome

11    cover issue should be something that is never

12    repaired, maybe gaskets, but not $1,400, $1,500

13    every time they went to the shop.  It's an unusual

14    repair and I saw quite a few of those.  I think if I

burns may 17 06.txt

7    in this time period.  Pinnacle had thirty-two plus

8    three out of service, thirty-two non out of service,

9    but the Clark fleet is four times as big.  Clark has

10   a good operation.  When you look at those kinds of

11   things, you say, "Why isn't Pinnacle being operated

12   that same way?"  I mean, there's a certain standard

13   that Clark has established and maintained at RDC

14   Clark.  These are the facts that are on the web.

15   Anybody can look at them.

16       Q.  You mentioned earlier with regard to your

17   opinion that the repairs are "grossly overstated,"

18   that there's not a scientific way to determine which

19   part is Halpin and which part is Clark; am I

20   correct?

21       A.  That's correct.

22       Q.  So am I also correct then that your

23   statement that, "The repairs are grossly

24   overstated," are based upon your subjective

☐

78

1    viewpoint?

2        A.  That would be correct.

Page 90

burns may 17 06.txt

3      Q.   Is there a recognized industry methodology

4    by which one would determine that these repairs are

5    "grossly overstated"?

6      A.   Well, when you say "grossly overstated,"

7    again I'm not saying the bills themselves were

8    exorbitant.  I'm saying the amount that they're

9    trying to attribute.  I don't know of any industry

10   standard other than a dart board or a Ouija board to

11   be able to come up and say that's when that rear

12   hanger assembly became loose.  You would be able to

13   have a better idea if you had the daily vehicle

14   inspection records and the maintenance files.

15     Q.   Am I correct in my understanding that in

16   reaching your conclusion about overstating the

17   repaired trailers attributable to Halpin, that you

18   did not consider in that opinion the representations

19   that were made by Alice Halpin to Clark at the time

20   Clark purchased those trailers?

21     A.   That's correct.

22     Q.   Am I also correct that since you had not

23   reviewed the safety records of that fleet prior to

24   purchase and since you did not have information

burns may 17 06.txt

23  If he didn't write it up and he knew he went out the

24  next morning with the same issue, that's when you

☐

86

1   set up a penalty or fine system or something that

2   you do to encourage them to do it correctly.  That's

3   a carrier's responsibility.  Did I answer that

4   question?

5      Q.  I'm not sure.

6             Were you provided any information

7   concerning Ronald Halpin's maintenance practices

8   when he was alive?

9      A.  No specific documents were ever produced,

10  only what I've read about his practices.

11     Q.  You read that in the deposition --

12     A.  Postmortem, obviously.

13     Q.  You read that in the deposition of Dan

14  Hill?

15     A.  Correct.  As I said, I spoke with Mr.

16  Murphy about the inspection process.

17     Q.  Do you recall having read in the deposition

18  of Dan Hill that Ron Halpin had a regular practice

burns may 17 06.txt

15    getting a baseline as to where that fleet is.

16         Q.   Let's talk about the fleet for a minute,

17    and then we'll come back to the opinion.

18              Are you familiar with the specification

19    of each trailer in the fleet?

20         A.   Insofar as?

21         Q.   What type of trailer it was, and what kind

22    of equipment it had on it?

23         A.   I couldn't recite anything to you.  I'd

24    have to look at the -- the only information I had

☐

88

1     was on the bill, so if the bill says it's a 1989

2     Heil, that's what it is.

3          Q.   But am I correct that a 1981 Heil can have

4     different accessories, different suspensions,

5     different compartment sizes?

6          A.   Correct.  Some of those specifications may

7     have been -- I don't know exactly which ones, but

8     you would have to look back at the regulations to

9     see when certain things were to be upgraded at a

10    certain time.

Page 102

burns may 17 06.txt

11      Q.  But am I correct that from the repair

12   records all you know is the year and make or

13   manufacturer --

14      A.  As represented by the repair facility.

15   Correct.

16      Q.  From those records, you do not know what

17   accessories were on that particular tank or how that

18   tank was configured?

19      A.  No, you wouldn't know that.

20      Q.  Are you aware of the number of tractors and

21   trailers that were inspected by Clark prior to the

22   closing?

23      A.  I read something about that in his

24   deposition, don't have a specific recollection of if

☐

89

1   it was a thorough review or not.

2      Q.  Are you aware of any time constraints that

3   were placed upon Clark in conducting its

4   inspections?

5      A.  Only what I might have read in the

6   deposition.  I have no knowledge of that.

Page 103

burns may 17 06.txt

3      A.   No, because you can go find a place to pick

4   it up.  I mean, I'm being very honest here.  You're

5   asking me a question.  You got to do the job.

6      Q.   My question is:  If you did not have access

7   to lifts to do that, does that impact your opinion?

8      A.   No.

9      Q.   Mr. Burns, are you a certified tester as

10  defined in Section 180.409 of the DOT regs?

11     A.   And as I was always taught at the Academy

12  of Advanced Traffic, you don't have to know the

13  site, you just have to know where to find it.  What

14  specifically are you talking about?  The one and

15  five year inspector?

16     Q.   Authorized inspector as defined.

17     A.   No.  As I mentioned, I don't do

18  maintenance.

19     Q.   Are you a registered inspector?

20     A.   No.

21     Q.   Are you an inspector of any kind?

22     A.   Not with respect to maintenance issues.

23     Q.   Have you ever been qualified as a motor

24  carrier inspector?

burns may 17 06.txt

91

1      A.  No.

2      Q.  Coming back then to the opinion.  Page 4, a

3   little over three quarters of the way down the page

4   there's a sentence that reads, "Many of the types of

5   defects would be easily detected or could be

6   presumed to exist in tanks that were fifteen years

7   old."  Tell me the methodology that you went through

8   to determine that the types of defects noted in the

9   repair sheets in the book would be easily detected.

10      A.  On a fifteen-year-old tank, as I've

11   mentioned before on the domes, the manhole covers,

12   and I don't know specifically when the mandates were

13   issued by DOT to upgrade.  I know that they have

14   been mandated, and the carriers had so many years to

15   do it, a percentage of your fleet every five years

16   or some formula they had.  It's in the regulations.

17   If I was an experienced operator like Mr. Clark is,

18   I would be checking that because when you get into

19   those older trailers, it's easy to forget to do the

20   upgrade.  It's just one of the things you do to

21   cross the Ts and dot the Is.

22      Q.  If you knew that --

Page 106

burns may 17 06.txt

 3    done any, or it's possible I may have picked that up

 4    initially from my look at what's on the web for

 5    the --

 6        Q.   Investigation?

 7        A.   -- compliance review.

 8        Q.   But you have no knowledge of what period

 9    these drivers had gone without training?

10        A.   Not specifically.

11        Q.   Have you arrived at a conclusion with

12    regard to what, if any dollar amount, in the claims

13    that you've reviewed, the trailers and the hazardous

14    materials training, what dollar amount of those

15    claims is properly attributable to Halpin?

16        A.   I'm only in my notes stage here on that,

17    and I'm feverishly trying to wrap it up because I

18    know it's got to come to a conclusion.

19        Q.   Do you yet have a sense as to a percentage?

20        A.   I would only be speculating, but it could

21    be like forty percent should be attributable to

22    Clark, but I can't --

23        Q.   Describe for me the process that you're

24    going through in your notes to determine that.

burns may 17 06.txt

103

1      A.   Again, as I stated, I look at the bill.

2    Let's say the $5,000 one where three was for tank

3    inspections, and the other two for general

4    maintenance.  When you think of no other records to

5    look at other than what happened during the last

6    seven, eight, nine months, what portion would be

7    general wear and tear, what would be neglect, that

8    type of thing.  That's specific to every piece of

9    vehicle.  That's what's taking so long.

10     Q.   Is there any scientific or industry

11   literature that you can identify that prescribes the

12   method to use in reaching that forty/sixty split?

13     A.   I would say, no, there isn't, due to the

14   fact that every piece of equipment is used under

15   different operating conditions.  The Halpin fleet --

16   the China Grove fleet specifically was up in the

17   Berkshires, which is a little bit tougher on the

18   vehicle than something let's say in southern

19   Connecticut.  So that's what you would look at.  You

20   would have to look at the terrain, the weather

21   conditions, all those kinds of things that makes it

22   more difficult to operate a vehicle.  There's

Page 120

burns may 17 06.txt

23   different expense variables when you're operating in

24   different kinds of locations, city versus country,

□

104

1    that type of thing.  So nobody's ever developed

2    anything like that.

3        Q.  No one's developed a methodology for doing

4    that with scientific precision?

5        A.  That would be my opinion.

6        Q.  Are there any recognized authorities that

7    you're using in your review and analysis?

8        A.  Well, again as I go back to the files, what

9    are you going to show somebody?  Just bills and

10   apparently false one and five year inspection

11   reports.  There's no other points that you can refer

12   back to.  There's no files.

13       Q.  I'm asking if there are any recognized

14   industry authorities, books or so forth, that you're

15   referring to in conducting your analysis?

16       A.  It would just be based on -- all of these

17   issues are driven by the regulations, and what it

18   costs you to comply with the regulation, nobody

Page 121

burns may 17 06.txt

19   particularly cares.  It costs more, for example, to

20   comply with DOT regulations in New England than it

21   might out on the west coast because of the different

22   operating conditions.

23      Q.  Is there any method that you're aware of to

24   test the degree of accuracy of the conclusions that

105

1   you've reached or are in the process of reaching?

2      A.  No.

3      Q.  In your review and analysis, have you

4   engaged anyone in a peer review of your methodology

5   or your conclusions?

6      A.  Not specifically.

7      Q.  You've mentioned that you did not review

8   and did not rely upon in reaching your conclusions

9   the representations and warranties made by the

10   Halpins to the Clarks in the purchase documents; is

11   that correct?

12      A.  That's correct.

13      Q.  You have also referred on a couple of

14   occasions to the kinds of things that one might look

Page 122