UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  05-30046-KPN

| | |
|---|---|
| ALICE W. HALPIN,<br><br>             Plaintiff<br><br>v.<br><br><br>RDC OF CONNECTICUT, INC., R.D.<br>CLARK AND SONS, INC., KATELAND<br>LEASING, INC., PINNACLE<br>TRANSPORTATION, INC. AND<br>CHINA GROVE TRANSPORT, INC.<br><br><br>             Defendants | |

**PLAINTIFF'S MOTION IN LIMINE IN OPPOSITION TO DEFENDANTS'**
**MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF JAMES M. BURNS**

The Plaintiff, Alice W. Halpin, moves to oppose the Defendants' motion *in limine* to exclude the expert testimony of James M. Burns.  Mr. Burns is a highly qualified expert retained to provide an analysis of damages claimed by the defendants as and attributed to the plaintiff.  The proffered expert testimony is reliable, relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue. As such, the plaintiff respectfully requests that the Court permit the expert testimony of James M. Burns.

## ARGUMENT

### I.  The Law on Admissibility Of Expert Testimony

In determining whether Mr. Burns should be permitted to testify as an expert the Court must apply Federal Rule of Evidence 702, as interpreted by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire

1

Co., Ltd. V. Carmichael, 526 U.S. 137 (1999).  An expert witness must possess "scientific, technical, or other specialized knowledge" and be qualified as an expert by his or her "knowledge, skill, experience, training or education."  Fed. R. Evid. 702.  The "central question is whether the expert's testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" American Computer Innovators, Inc. v. Electronic Data Systems Corp., 74 F.Supp.2d 64, 66 (1999) (quoting Fed. R. Evid. 702).

In order to assess whether an expert's testimony will assist the trier of fact, the "trial judge must, first, confirm that the testimony is relevant and, second, make a 'preliminary assessment of whether the reasoning and methodology underlying the testimony is scientifically valid and…whether that reasoning or methodology properly can be applied to the facts at issue.'" American Computer, at 66-67 (quoting Daubert, at 592-93).  Essentially, the court must determine whether the proffered expert testimony is both reliable and relevant.

To assist in the determination of reliability, the Daubert court suggested several factors.  These factors are: (1) whether the theory or technique has been, or can be, tested; (2) whether it has been subjected to peer review and/or publication; (3) whether the theory or technique exhibits a known or potential rate of error; and (4) whether it has been generally accepted in the applicable industry. Daubert, at 589-595. However, these factors are neither "necessarily nor exclusively" applied to all experts or in each and every case. Agri-Mark, Inc. v. Niro Inc., 214 F.Supp.2d 33, 45 (quoting Kumho, at 141).  Rather, the court is given broad latitude in this determination and "must keep in mind…that the inquiry under Rule 702 is flexible." American Computer, at 67.

2

Furthermore, it is vital to note that the Supreme Court's chief concern in <u>Daubert</u> was the problem of jury exposure to confusing and unreliable expert testimony. <u>See Daubert</u> at 595-97. Here, the case is tried to the court and the concerns of <u>Daubert</u> are therefore of substantially lesser import. 105 ALR Fed. 299, citing <u>Loeffel Steel Products, Inc. v. Delta Brands, Inc.</u>, 372 F.Supp.2d 1104, 1122 (N.D. Illinois 2005). Numerous courts have found this reasoning persuasive. For instance, the Fifth Circuit stated that "most of the safeguards provided for in <u>Daubert</u> are not as essential in a case…where a district judge sits as the trier of fact in place of a jury." <u>Gibbs v. Gibbs</u>, 210 F.3d 491, 500 (5th Cir. 2000). <u>See</u> <u>Seaboard Lumber Co. v. United States</u>, 308 F.3d 1283, 1301-02 (Fed.Cir. 2002), <u>Smithkline Beecham Corp. v. Apotex Corp.</u>, 247 F.Supp.2d 1011, 1041-42 (N.D. Ill. 2003).

## II. James M. Burns Is Qualified As An Expert

The Defendants' argument that Mr. Burns fails to qualify as an expert under Rule 702 is unfounded. Review of his Expert Report, resume and relevant portions of his deposition transcripts, makes abundantly clear that he has in-depth, life long, personal experience in the area in question.[1] His qualifications are extensive, including a near 30 year membership in the Association for Transportation Law Professionals, and service as a consultant to the motor carrier industry for over 30 years regarding U.S. DOT compliance and enforcement. Mr. Burns has conducted numerous in-house DOT safety and compliance reviews and is familiar with the laws and regulations regarding transportation of hazardous materials and the disposal of same. Expert Report, Exhibit A at 1-2. Resume, Exhibit B at 1-3. Deposition, Exhibit C at 5-10.

---

[1] A copy of Mr. Burn's Expert Report is attached hereto as Exhibit A, his resume as Exhibit B, and relevant portions of his deposition transcripts as Exhibit C.

Moreover, Mr. Burns' publishes a monthly newsletter regarding transportation issues and is a regular speaker before transportation trade groups and associations. Currently, Mr. Burns is a principal in the TransLaw group, Inc., a Massachusetts business, which provides consulting services in the "transportation, logistics, commerce and regulatory aspects of the motor carrier industry." Expert Report, Exhibit A at 1. Resume, Exhibit B at 1-2. Deposition, Exhibit C at 10-12.

Mr. Burns' expertise, gained from both formal training and a life-time of experience in the motor carrier industry, places him well beyond that of the average trier of fact in properly assessing the reasonableness of costs attributed to the plaintiff for compliance with DOT regulations.  Similarly, he is properly equipped to gauge the reasonableness of costs associated with lost product resulting from spoilage and from hazardous material spills.  He is well versed in the facts of this case, examined all relevant documents and has performed thorough independent research. Expert Report, Exhibit A at 3.  As such, Mr. Burns' is qualified as an expert under Rule 702 and his proffered testimony would undoubtedly assist the trier of fact to understand the evidence or to determine a material fact at issue.

### III.  Mr. Burns' Proffered Testimony Is Both Reliable And Relevant

The court must determine whether the proffered expert testimony is both reliable and relevant.  Here, both of those requirements are easily satisfied.  As to reliability, the testimony must be based "in the knowledge and experience of [the relevant] discipline." Kumho Tire, at 1175 (quoting Daubert, at 592).  It is unquestionable that utilizing a life-time of accumulated expert knowledge and skill in the transportation industry, in order to accurately assess the reasonableness of various transportation costs, establishes Mr. Burns' testimony as a trustworthy source within the discipline at issue.

As to the Daubert factors regarding reliability, it is important to reiterate that they are to be viewed broadly. They are not to be considered exclusive nor necessary elements. In fact, the court has been given clear instruction to determine reliability in whatever manner it sees fit. Agri-Mark, at 45 (citing Kumho, at 141-42). Therefore, the defendant's strict reliance upon these illustrative factors in an attempt to classify the testimony as unreliable is misguided. Though Mr. Burns' testimony is unable to be quantifiably tested, his expert opinion is nonetheless reliable and based upon a substantial body of knowledge.

Additionally, while isolated statements can be taken out of context and misconstrued as indicating a lack of expertise or relevance, Mr. Burns' proffered testimony will only be offered to establish that the proportion of the repair costs attributed by the defendant to the plaintiff is overstated. He makes no claim to being an expert in performing mechanical repairs and will not speak to the reasonableness of the repair costs as a whole. Based on his experience, he can shed light on the nature and extent of reasonable "wear and tear" repairs verses repairs solely attributable as necessary to rectify one and five year tank inspection requirements. Therefore, the opinions expressed will be solely to those relevant issues of which Mr. Burns is sufficiently familiar and retains considerable expertise. Those issues lie directly at the heart of the case and his testimony in that regard will certainly assist the trier of fact.

Furthermore, as to both the reliability and relevance of the proffered testimony, the fact that this case is being tried to the court is significant. There is no potential for confusion or improper persuasion. These issues are simply not overriding concerns in the absence of a jury.

## CONCLUSION

WHEREFORE, for all the reasons stated herein, the proffered expert testimony of James M. Burns should be permitted. Inquiries conducted under Rule 702 are flexible, particularly when the concerns of <u>Daubert</u> are lessened or nonexistent on account of the case being tried to the court. Even so, Mr. Burns is well qualified as an expert and possesses specialized knowledge acquired via considerable experience, training and education in an area where it is assumed the Court may need assistance in navigating, understanding and applying complex and technical federal regulation of the transportation industry. His testimony is both reliable and relevant. Furthermore, Mr. Burns' proffered testimony will greatly assist the trier of fact to understand the evidence or to determine a fact in issue.

Accordingly, the plaintiff respectfully requests that the proffered expert testimony of Mr. Burns be permitted or that voir dire on the qualifications of Mr. Burns be conducted and/or that his testimony be admitted *de bene*.

Respectfully submitted,
The Plaintiff,
Alice W. Halpin,
By Her Attorney,

/s/Robert S. Murphy, Jr.
ROBERT S. MURPHY, JR., ESQUIRE
BACON & WILSON, P.C.
33 State Street
Springfield, MA 01103
Ph: (413) 781-0560
Fax: (413) 739-7740
BBO# 550804
June 20, 2006

### CERTIFICATE OF SERVICE

I, ROBERT S. MURPHY, JR., hereby certify that on 20th day of June, 2006, I caused a copy of the foregoing Motion in Limine in Opposition to the Defendants' Motion in Limine to Exclude the Expert Testimony of James M. Burns to be served upon all interested parties by hand delivering a copy thereof to: Michael E. MacDonald, Esq., Cain Hibbard Myers & Cook, PC, 66 West Street, Pittsfield, MA 01201-5764

/s/Robert S. Murphy, Jr.
ROBERT S. MURPHY, JR.

457614

EXHIBIT "A"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  05-30046-KPN

ALICE W. HALPIN,

              Plaintiff

v.

RDC OF CONNECTICUT, INC., R.D.
CLARK AND SONS, INC., KATELAND
LEASING, INC., PINNACLE
TRANSPORTATION, INC. AND
CHINA GROVE TRANSPORT, INC.

              Defendants

## EXPERT REPORT OF JAMES M. BURNS

### I.    ASSIGNMENT

1.    I have been retained by counsel for Alice W. Halpin  ("Halpin") to provide an analysis of damages claimed by RDC of Connecticut, Inc. ("RDC"), R.D. Clark & Sons, Inc., ("Clark"), Kateland Leasing, Inc. ("Kateland"), Pinnacle Transportation, Inc. ("Pinnacle") and China Grove Transport, Inc. ("China Grove") in the above-captioned matter.

### II.    QUALIFICATIONS

2.    I am a principal of the TransLaw Group, Inc., a Springfield, Massachusetts based business, which provides consulting services in the transportation, logistics, commerce and regulatory aspects of the motor carrier industry.  I have been in private practice before the Interstate Commerce Commission, United States Department of

Transportation, the Federal Maritime Commission and various state regulatory agencies. I have been a member of the Association for Transportation Law Professionals since 1977. I have been a consultant to the motor carrier industry for more than thirty years consulting regarding U.S. DOT compliance and enforcement issues and have conducted in-house safety reviews monitoring compliance with U.S. DOT rules and regulations. I am familiar with laws and regulations regarding the transportation of hazardous materials and the disposal of same. I have experience with regard to safety training and drug testing of CDL drivers. See attached Resume.

III.    **SCOPE OF ANALYSIS**

3.    RDC's claims that it has accrued maintenance bills in excess of $187,000.00 in order to comply with DOT regulation. It further alleges that it incurred an expense of approximately $167,200.00 or lost product resulting from spoilage of 88,000 gallons of petroleum product which it alleges was improperly unloaded by employees "inherited by RDC" and an additional $21,000.00 for hazardous material spills allegedly caused by improperly trained drivers. RDC also alleges that it incurred an expense in the approximate amount of $123,590.00 in excess of escrow for repairs of identified deficiencies in the motor carrier fleet. I have been asked to provide analysis of the above-referenced claims on behalf of Alice Halpin.

4.    In completion of this assignment, I reviewed documents produced by both parties, read deposition testimony and performed independent research. I also spoke with representatives of Alice Halpin. I have reviewed the deposition transcripts of Daniel Hill, Robert Clark and Susan Halpin. I have reviewed other documents including invoices, one and five year tank inspection records, a DOT investigative report, relevant schedules from the Stock Purchase Agreement and other correspondence related to those issues. In general, I relied on the following types of information:

- Documentation related to one and five year inspections from various providers;

- DOT rules and regulations;

- Deposition testimony;

- Various court filings;

- Discussions with Alice Halpin's representatives;

- Experience regarding hazardous materials training and disposal.

5.    This report and the opinions expressed herein are based on my analysis of the materials I have reviewed to date. I understand that discovery is on going. I may supplement, refine or revise my analysis as appropriate, if additional testimony, documents or other discovery materials become available. In particular, if any expert reports are submitted on behalf of RDC, I expect to be asked to review any expert analysis related to RDC's claims, and to prepare a rebuttal report if

appropriate. I am being compensated at a rate of $275.00 per hour of time I incur on this matter and a fee of $1,750.00 per day for attendance at court proceedings. Payment is not contingent on my findings or on the outcome of this case.

## IV.   STATEMENT OF OPINIONS TO BE EXPRESSED AND BASIS AND REASONS THEREFOR

6.   RDC's claims for fleet repair are grossly overstated. This opinion is based on my review of fleet repair records generated as a result of 1 and 5 year inspections. Defects claimed necessary to repair to pass the 1 and 5 year inspections appear to have been either in existence at the time RDC inspected the fleet prior to purchase or they arose due to ordinary wear and tear on the fleet during the winter of 2003-2004. The complained of conditions would have been easily uncovered either during a thorough inspection prior to purchase or during monthly inspections of the fleet once RDC purchased it. Absence of any fleet records noting the problems within 60 days of the purchase leads me to conclude that the conditions were either already known and ignored or that they resulted from use after the purchase. Many of the types of defects would be easily detected or could be presumed to exist in tanks that were 15 years old. Robert Clark is known to me as an experienced operator/owner in the transportation industry who would have or should have been well-aware of the condition of the fleet prior to or shortly after purchasing it. Without detailed records of maintenance or inspection both before

and after the purchase, it is impossible to determine when the tankers came out of compliance with DOT regulations.

RDC claims for expenses related to lost product after assuming ownership and control of Pinnacle and China Grove are without merit. Training employees in the proper delivery of and/or response to spills of hazardous materials is an evolving and on-going process. RDC is required by DOT regulations to train its employees yearly. The "cross-drop" incidents are not ordinarily the subject matter of hazmat training since it does not involve a "release" of the hazardous material. Evidence of cross-drops occurring even after RDC provided company-wide hazmat training demonstrates that the cross-drops were caused by human error and not any systematic lack of training. As with any preventative training program, my experience in that field confirms that attendance at training programs does not guarantee that spills or cross-drops won't occur.

SIGNED:

    /s/James F. Burns
JAMES F. BURNS

# RESUME – JAMES M. BURNS

## PERSONAL INFORMATION

| | |
|---|---|
| Name: | James M. Burns |
| Address: | 40 Wildflower Lane<br>Longmeadow, MA  01106 |
| Date of Birth: | February 29, 1948 |
| Telephone Number: | 413 567 6680 |

## PROFESSIONAL INFORMATION

| | |
|---|---|
| Employer: | The Translaw Group, Inc. |
| Address: | Suite 304  935 Main Street<br>Springfield, MA  01101-4835 |
| Telephone Number: | 413 781 8205 |
| Facsimile: | 413 734 7839 |
| Cell: | 413 539 8219 |
| Email: | JBURNS@TRANSREGS.COM |
| Web Site: | www.transregs.com |

## EDUCATIONAL AND PROFESSIONAL QUALIFICATIONS

### Education Qualifications

| | |
|---|---|
| 1962 – 1966 | Longmeadow High School |
| 1966 – 1968 | Holyoke Community College<br>Holyoke, Massachusetts<br>*Associates Degree, Business Administration* |
| 1976 – 1977 | Academy of Advanced Traffic<br>New York City, New York<br>*Transportation Law Certificate* |

THE TRANSLAW GROUP, INC.

# RESUME – JAMES M. BURNS

## Professional Qualifications

| | |
|---|---|
| 1977 | Admitted to practice before the |

- Interstate Commerce Commission
- Untied State Department of Transportation, Federal Motor Carrier Safety Administration
- Federal Maritime Commission
- Various state transportation regulatory commissions
- Ontario Ministry of Transportation
- Quebec Ministry of Transportation

| | |
|---|---|
| Member: | The Association of Transportation Law Professionals |

## EMPLOYMENT HISTORY

**1968 – 1973**

Warehouse Transport, Inc.
Springfield, MA

Transportation Supervisor

Contract Carrier to the Great Atlantic & Pacific Tea Company.

**1973 – 1977**

Pittsburgh & New England Trucking Company
Dravosburg, PA

New England Regional Manager

Multi State heavy and specialized carrier

**1977 – Present**

The Translaw Group, Inc.

A transportation regulatory permitting, compliance, and consulting practice.

Principal/Registered Practitioner, private practice, representing,

- for-hire motor carriers,
- private carriers,
- fleet operators,

2

## RESUME – JAMES M. BURNS

- freight forwarders,
- brokers,
- independent ocean forwarders and;
- various shipper interest,

on a variety of complex regulatory compliance issues, simulated compliance reviews, and regulatory permitting relative to drivers, vehicles and entities.

Publications and Lectures:

**TRANSTRENDS**, a monthly regulatory newsletter with a readership of approximately 450 subscribers.

Regular speaker before various transportation trade groups and transportation associations.

THE TRANSLAW GROUP, INC.

3

EXHIBIT "B"

# RESUME – JAMES M. BURNS

## PERSONAL INFORMATION

Name:                              James M. Burns

Address:                           40 Wildflower Lane
                                   Longmeadow, MA  01106

Date of Birth:                     February 29, 1948

Telephone Number:                  413 567 6680

## PROFESSIONAL INFORMATION

Employer:                          The Translaw Group, Inc.

Address:                           Suite 304  935 Main Street
                                   Springfield, MA  01101-4835

Telephone Number:                  413 781 8205

Facsimile:                         413 734 7839

Cell:                              413 539 8219

Email:                             JBURNS@TRANSREGS.COM

Web Site:                          www.transregs.com

## EDUCATIONAL AND PROFESSIONAL QUALIFICATIONS

### Education Qualifications

1962 – 1966                        Longmeadow High School

1966 – 1968                        Holyoke Community College
                                   Holyoke, Massachusetts
                                   *Associates Degree, Business Administration*

1976 – 1977                        Academy of Advanced Traffic
                                   New York City, New York
                                   *Transportation Law Certificate*

THE TRANSLAW GROUP, INC.

# RESUME – JAMES M. BURNS

## Professional Qualifications

1977

Admitted to practice before the
- Interstate Commerce Commission
- Untied State Department of Transportation, Federal Motor Carrier Safety Administration
- Federal Maritime Commission
- Various state transportation regulatory commissions
- Ontario Ministry of Transportation
- Quebec Ministry of Transportation

Member:

The Association of Transportation Law Professionals

## EMPLOYMENT HISTORY

1968 – 1973

Warehouse Transport, Inc.
Springfield, MA

Transportation Supervisor

Contract Carrier to the Great Atlantic & Pacific Tea Company.

1973 – 1977

Pittsburgh & New England Trucking Company
Dravosburg, PA

New England Regional Manager

Multi State heavy and specialized carrier

1977 – Present

The Translaw Group, Inc.

A transportation regulatory permitting, compliance, and consulting practice.

Principal/Registered Practitioner, private practice, representing,
- for-hire motor carriers,
- private carriers,
- fleet operators,

2

## RESUME – JAMES M. BURNS

- freight forwarders,
- brokers,
- independent ocean forwarders and;
- various shipper interest,

on a variety of complex regulatory compliance issues, simulated compliance reviews, and regulatory permitting relative to drivers, vehicles and entities.

Publications and Lectures:

**TRANSTRENDS**, a monthly regulatory newsletter with a readership of approximately 450 subscribers.

Regular speaker before various transportation trade groups and transportation associations.

THE TRANSLAW GROUP, INC.

EXHIBIT "C"

5

1    unclear, please ask me to rephrase.  If you need a

2    break speak up.

3              Could you state your name for the

4    record, please.

5        A.    James M. Burns.

6        Q.    What's your residential address, Mr. Burns?

7        A.    40 Wildflower lane, Longmeadow,

8    Massachusetts 01106.

9        Q.    For how long have you lived there?

10        A.    About twenty-eight years.

11        Q.    Do you have a business address?

12        A.    Yes.  935 Main Street, Suite 304, I

13    believe, Springfield, Massachusetts 01103.

14        Q.    How old are you, Mr. Burns?

15        A.    Fifty-eight.

16        Q.    What is your occupation, sir?

17        A.    Well, it's called a practitioner before the

18    Federal Motor Carrier Safety Administration.  It's a

19    nonattorney practice of administrative law where

20    you're admitted to practice by the Federal

21    Transportation Agencies.  I also practice on

22    occasion before the Federal Maritime Commission, and

23    several of the states allow my appearance as well on

24    transportation matters.  So what do you call that, a

6

1    registered practitioner is what we call it.

2                    MR. MACDONALD:  If we could mark that?

3                    (Exhibit 1, resume, marked)

4    BY MR. MACDONALD:

5        Q.   Mr. Burns, let me hand you a document

6    marked as JB-1.  Have you seen that before?

7        A.   Yes, I have.

8        Q.   What is that, sir?

9        A.   It's my resume basically.

10       Q.   I assume you prepared that document?

11       A.   I did.

12       Q.   Walking through what's been marked JB-1,

13   does that reflect your entire work history?

14       A.   Yes.

15       Q.   Is there anything not on there concerning

16   your work history?

17       A.   Well, part-time jobs prior to graduating

18   from school, I guess.

19       Q.   Anything that's relevant to your work as a

20   registered practitioner?

21       A.   Not at all.

22       Q.   Is your entire education history listed on

23   JB-1?

24       A.   Yes, it would be.

7

1    Q.    With regard to the Academy of Advanced

2  Traffic, could you describe that institution?

3    A.    I know it has a cheesy sounding name but at

4  the time when it was in business, it was one of the

5  most recognized transportation educational

6  institutions that prepared people for the ICC

7  practitioner's exam.  It was in New York City, the

8  World Trade Center actually.  It was one class per

9  week for six months, and we had a once a week study

10  group also in New York City.  So I travelled to New

11  York twice a week for six months.

12    Q.    How many hours was that class each week?

13    A.    About three hours.

14    Q.    And it says on the bottom Transportation

15  Law Certificate --

16    A.    That was issued -- excuse me.  I'm sorry.

17    Q.    What does that certificate entitle you to

18  do?

19    A.    That was issued by the Academy of Advanced

20  Traffic.  It just represented that you went through

21  their program.

22    Q.    So having that certificate alone does not

23  entitle you to practice before the ICC?

24    A.    No, it does not.

8

1    Q.   Does it entitle you to appear before any

2    other state or federal agency?

3    A.   One may use it as part of the

4    qualifications to apply to take the exam before the

5    formal Interstate Commerce Commission.  When I say

6    "ICC, Federal Motor Carrier Safety," ICC has been

7    put into the sunset in 1995.  The Federal Motor

8    Carrier took over all their regulations so if I

9    refer to ICC, it's not a current active organization

10   but for purposes of my history, it was certainly the

11   major part of my experience.

12   Q.   When the ICC was eliminated by the federal

13   government, was there any additional testing you

14   needed to take to appear before the Federal Motor

15   Carrier Safety Bureau?

16   A.   No.  We were grandfathered in.

17   Q.   Do you know if the Academy of Advanced

18   Traffic still exists?

19   A.   It does.  Specifically the name I'm not

20   quite sure, but it's evolved into more of an online

21   home study program.

22   Q.   Is that a continuation of the same

23   organization?

24   A.   It is.  They've added more.

9

1    Q.    Do you know if it goes by the same name?

2    A.    I'm not quite sure.

3    Q.    After conclusion of your studies at the

4  Academy of Advanced Traffic, have you taken any

5  other formal courses?

6    A.    Insofar as formal courses, different

7  programs offered by our Association.  They have two

8  programs each year, and they generally run over a

9  two to three day period.  I've attended over the

10  thirty years perhaps ten or fifteen.

11    Q.    When you refer to "our association," would

12  that be The Association of Transportation Law

13  Professionals?

14    A.    That's correct.

15    Q.    Back on the Academy of Advanced Traffic, do

16  you know if that's an accredited education

17  institution?

18    A.    I have no idea, highly recognized.

19    Q.    The courses taken through the Association

20  of Transportation Law Professionals, are those

21  accredited courses?

22    A.    They would be because if you're an

23  attorney, you get credits for the different

24  components of the multiday program, ethics and so

10

1    forth.  As a nonattorney admitted to practice, I'm

2    not required to submit any further -- the bar is an

3    individual state, as you know, an individual state

4    issue.

5        Q.    When you say you get credits, do you get

6    credits toward a degree or do you get credits on --

7        A.    Continuing education.

8        Q.    On JB-1 you've listed from '97 to present

9    the Translaw Group, Inc.  Is that where you're

10   currently employed?

11       A.    Yes.

12       Q.    What is that organization?

13       A.    It's my practice, my own operation.

14       Q.    Did you form it?

15       A.    Yes, I did.

16       Q.    Did you incorporate it in 1997?

17       A.    No.

18       Q.    When was it incorporated?

19       A.    Probably '97 or '98.

20       Q.    How many employees does the Translaw Group,

21   Inc. have?

22       A.    Four.

23       Q.    Who are they and what are their job

24   responsibilities?

PERLIK AND COYLE REPORTING

11

1    A.    Myself, my son Todd.    He handles data entry

2    on a fuel tax service for motor carriers.    My wife,

3    who does the bookkeeping, billing, and Marie Curcio,

4    C-u-r-c-i-o, she's our secretary.    We have,

5    generally, a part-time data entry high school kid.

6    Q.    Does Todd, your wife, or Marie Curcio hold

7    any certifications to practice before any state or

8    federal transportation agencies?

9    A.    No.

10    Q.    Do any of those individuals bill their time

11    to clients of Translaw Group, Inc.?

12    A.    No.

13    Q.    What is the largest number of employees The

14    Translaw Group, Inc. has employed over its history?

15    A.    That would be it.

16    Q.    Could you describe your job

17    responsibilities at Translaw Group, Inc.?

18    A.    Well, I handle all the client issues that

19    come up when they call for questions about

20    regulations, how it affects them, what effect a new

21    regulation may have, preparing applications,

22    preparing contracts for contract carrier agreements

23    or operator lease agreements, vehicle lease

24    agreement, the fuel tax issues that come up with

PERLIK AND COYLE REPORTING

12

motor carriers, the audits that state agencies

conduct.  I attend those, finalize them, wrap them

up, highway use tax issues that come up.  All of the

regulatory matters that affect not only a motor

carrier but free forwarders and brokers and so

forth.  They're all regulated by The Federal Motor

Carrier Safety Administration.

Q.    Is it a fair statement that the bulk of

your time at Translaw Group, Inc. is spent dealing

with regulatory matters on behalf of clients of that

organization?

A.    A majority certainly.

Q.    What percentage are dealing with federal as

opposed to state regulatory agencies?

A.    All the regulations basically flow from the

federal, and states have to comply generally with

state mandates.  They can make them more stringent,

so you sometimes have those issues but pretty much

with federal issues.

Q.    Going back to the top of your employment

history, Warehouse Transport, Inc., what were your

job responsibilities there as transportation

supervisor?

A.    We were the contract carrier to the A&P Tea